**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:17-cr-00318-WSD-RGV |
| | |
| ROBERT COLEMAN | |

**MAGISTRATE JUDGE'S REPORT, RECOMMENDATION,
AND ORDER ON DEFENDANT'S PRETRIAL MOTIONS**

Defendant Robert Coleman ("Coleman") is charged in a two-count indictment with knowingly possessing three firearms on August 19, 2017, and eight firearms on August 20, 2017, after having been previously convicted of a felony offense, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). [Doc. 8].[1] Coleman has moved to suppress statements he made to federal agents during an interview outside of his apartment upon the execution of a search warrant, [Doc. 19], and after an evidentiary hearing on February 15, 2018,[2] the parties filed post-hearing briefs,

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 31] for the transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the parties submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. __)" for the government's exhibits and "(Def. Ex. __)" for Coleman's exhibits.

[Docs. 34, 38, & 41].  For the reasons that follow, it is **RECOMMENDED** that Coleman's motion to suppress statements, [Doc. 19], be **DENIED**.

## I.  STATEMENT OF FACTS

Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Gary Dorman ("Agent Dorman") initiated an investigation after receiving information that an individual, later identified as Coleman, residing at apartment 3302 at 1371 Kimberly Way, Atlanta, Georgia, may have been involved in a burglary, or several burglaries, during which firearms were taken.  (Tr. at 3-4); [Doc. 1].  Based on this investigation, which included gaining knowledge that Coleman had prior felony convictions and had been arrested 18 or 19 times, Agent Dorman obtained a federal search warrant for the Kimberly Way apartment.  (Tr. at 4, 18, 25).

On August 20, 2017, at approximately 7:30 a.m., a team of about fifteen ATF agents and law enforcement personnel, including ATF Special Agent Nicholas Degennaro ("Agent Degennaro") and Agent Dorman, executed the federal search warrant at the Kimberly Way apartment.   (Tr. at 4-5, 30).  The ATF agents approached the residence, knocked on the front door while announcing their presence a minimum of three times, and breached the front door and made entry into the apartment after no one answered the door.  (Tr. at 5, 24, 33).  Upon entry, the agents encountered two children and seven adults, including Coleman, who was

found in one of the three bedrooms, and they secured the apartment by handcuffing and gathering all of the adults outside of the apartment. (Tr. at 5-7, 17, 30, 32). After they secured the apartment,[3] the agents allowed the two minor children and their mother to wait in the living room while another agent obtained biographical information, including name, date of birth, social security number, address, and phone number, from the other individuals. (Tr. at 7-8, 17).

During the execution of the warrant, ATF agents proceeded to interview the occupants of the apartment, and Coleman, who was the target of the investigation, was initially placed in a police car. (Tr. at 8-9, 23-25). Coleman was subsequently moved to Agent Dorman's vehicle and placed in the front passenger seat, with Agent Dorman seated in the driver's seat and Agent Degennaro seated directly behind Coleman in the rear passenger seat. (Id.). At this time, Agents Degennaro and Dorman identified themselves to Coleman, and Agent Dorman asked him about his name, including his "street name"; age; address; phone number; and educational background. (Tr. at 9-10, 18, 26).[4]

_____

[3] While securing the apartment, the agents observed several firearms, including one in Coleman's bedroom. (Tr. at 17-18, 34).

[4] These statements, as well as statements Coleman made after he was advised of his rights, were audio recorded. See (Tr. at 14, 18, 31-32; Gov. Ex. 2). The audio recording reflects that, prior to Coleman being advised of his rights, Agent Dorman identified himself, explained what ATF stood for and what ATF agents investigated generally, showed Coleman his credentials, and then asked Coleman his name;

Following this initial exchange, which lasted about four minutes and forty seconds, Agent Dorman advised Coleman of his <u>Miranda</u>[5] rights at approximately 7:55 a.m.  (Tr. at 11, 27; Gov. Exs. 1 & 2).  Specifically, Agent Dorman advised Coleman that he had the right to remain silent and that any statements he made could be used against him.  (Gov. Ex. 1; Gov. Ex. 2 at 04:40-04:44).  He further advised Coleman that he had the right to speak to an attorney, to have one present

_____

where he was from; how long he had lived in Atlanta; his age; where he went to high school; the highest level of education he had obtained; if he read, wrote, and spoke English; and if he had any "street" names.  <u>See</u> (Gov. Ex. 2 at 00:03-01:14).  Agent Dorman then asked Coleman if he knew what was going on and then explained that he was there to execute a federal search warrant and asked whether he lived in the Kimberly Way apartment and who else lived with him.  (<u>Id.</u> at 01:19-02:08).  When Coleman identified his address as the Kimberly Way apartment, Agent Degennaro asked him if he had provided another agent with a different address earlier, and Coleman responded affirmatively, and then explained that "when he had gotten out of custody that he didn't have anywhere to live, and . . . the address that he had given[ was] . . . the address that all of his friends had and his parole officer had."  (Tr. at 10-11, 26-27); <u>see also</u> (Gov. Ex. 2 at 02:11-02:48).  Agent Dorman then asked Coleman what he had been in jail for and Coleman responded, "a probation violation."  (Gov. Ex. 2 at 02:52-03:03).  Agent Dorman explained that he was investigating burglaries of federally licensed firearms dealers, and he advised Coleman that the agents were "executing a federal search warrant, and that he was not under arrest, it was a detention for investigative purposes," and Coleman asked whether this was "going against [his] probation," and Agent Dorman responded, "No, . . . you are not under arrest, I have not charged you."  (Tr. at 27; Gov. Ex. 2 at 03:06-03:16, 03:31-04:10).  Agent Dorman further explained that "because [Coleman] had handcuffs on one could reasonably assume that he was not free to leave," and he was therefore "going to read [him] [] Miranda rights, and [he could] make a decision whether or not [he] want[ed] to talk to [them] at that point or not."  (Tr. at 27; Gov. Ex. 2 at 04:11-04:28).

[5] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

4

during the questioning, to have one appointed for him if he could not afford one, and, in the event he proceeded with questioning without an attorney, to stop answering questions at any time.  (Gov. Ex. 1; Gov. Ex. 2 at 04:45-04:56).  Coleman indicated that he understood his rights, and he placed his initials beside each question on the pre-printed <u>Miranda</u> form and then read and signed the waiver of rights portion, which states:

> I have read this statement of my rights or it has been read to me, and I understand these rights.  At this time I am willing to answer questions without a lawyer present.  No promises or threats have been made to me and no pressure or force of any kind has been used against me.

(Tr. at 11, 27-28; Gov. Ex. 1; Gov. Ex. 2 at 04:56-05:18).  Agent Degennaro also signed the form as a witness.  (Tr. at 13; Gov. Ex. 1).[6]

After advising Coleman of his rights, the agents asked him various questions, and Coleman proceeded to make certain incriminating statements.  (Tr. at 13-14, 29; Gov. Ex. 2 at 07:04-1:04:35).  The interview lasted just over an hour, and after concluding the interview, the agents moved Coleman back to the other police vehicle, but about ten to fifteen minutes later, Coleman asked if he could again speak with Agents Dorman and Degennaro, and the agents led him back to Agent

---

[6] Coleman initially had his hands handcuffed behind him, but at this point, the agents handcuffed his hands in front of him in order to "make him comfortable."  (Tr. at 9, 25-26; Gov. Ex. 2 at 05:18-05:44).  The agents also turned off the air conditioning in the vehicle and opened the windows after Coleman indicated that he was cold.  (Tr. at 14; Gov. Ex. 2).

Dorman's vehicle and sat with him in the vehicle in the same positions as before. (Tr. at 11-12, 14-15, 29-30; Gov. Ex. 2 at 01:03:00-01:04:28).  Agent Dorman advised Coleman "that he was still under his Miranda warnings that [h]e gave him earlier," and Coleman proceeded to make additional incriminating statements.  (Tr. at 15, 30-31; Gov. Ex. 2 at 00:05-31:44).  This second interview lasted a little more than thirty minutes, and after concluding this second interview, Agent Dorman took Coleman back to the other police vehicle.  (Tr. at 15-16, 30-31; Gov. Ex. 2).  Coleman was subsequently placed under arrest that day, (Tr. at 18, 31, 33), and Agent Dorman obtained a criminal complaint the following day, (Tr. at 31); [Doc. 1].[7]

During the course of the interview, Coleman appeared to understand the questions asked of him and provided responsive answers, never declined to answer a question asked of him, never asked for an attorney, and did not appear to be under the influence of alcohol or drugs.  (Tr. at 12, 16, 28).  Coleman "mentioned that he had recently gotten shot . . . in his leg or thigh area," which "bothered him a little bit," but he never requested any pain medication or asked to get out of the vehicle. (Tr. at 12); see also (Gov. Ex. 2).  Neither Agent Dorman nor Agent Degennaro made

---

[7] Coleman's statements on August 20, 2017, were also relied upon in obtaining a search warrant for the second address he had provided, as well as for thirteen electronic devices.  See (Def. Exs. 1 & 2).

Coleman any promises in order to obtain a waiver of his rights, nor did they threaten him in any way. (Tr. at 28-29; Gov. Ex. 2).

Coleman was indicted on September 13, 2017, [Doc. 8], and he now moves to suppress the statements he made on August 20, 2017, [Doc. 19]. Following an evidentiary hearing and post-hearing briefing by the parties, [Docs. 31, 34, 38, & 41], the pending motion to suppress is now ripe for ruling.

## II. DISCUSSION

Coleman moves to suppress the statements he made during the interview at his residence upon the execution of the federal search warrant on the grounds that the statements made prior to being advised of his Miranda rights "went well beyond routine booking or biographical questions." [Doc. 34 at 1]. Coleman also argues that his "post-*Miranda* statement should be suppressed as tainted by the pre-Miranda questioning." [Id.]. The government responds that Coleman's pre-Miranda statements are admissible because Miranda warnings were not required at that time since he was not subjected to an interrogation, and that his post-Miranda statements are admissible because he knowingly and voluntarily waived his rights and agreed to speak with the ATF agents. See [Doc. 38].

A.    *Pre-Miranda Statements*

Coleman contends that the statements he made to Agents Dorman and Degennaro during the initial questioning were obtained in violation of <u>Miranda</u> because the agents "asked several questions designed to get [him] to incriminate himself, and to which his answers were testimonial." [Doc. 34 at 7].  In particular, Coleman points out that "[t]hose statements included, among others, his 'street' name, the length of time he had lived at the apartment, why he had given another address to the first officer, when he got out of jail, when[ ]he went in and why he went to jail," [<u>id.</u>], and that the agents "got him to admit, pre-*Miranda*, facts that would result in a probation violation at the very least," [<u>id.</u> at 8].  The government responds that the statements are admissible because "[t]here is no evidence . . . that the agents had any idea that Coleman would or could be prosecuted for [a state probation violation], nor is there any evidence that the agents had any control over whether such a prosecution would be brought," and the questions posed by Agent Dorman before the rendering of <u>Miranda</u> warnings were not "'designed' to elicit incriminating responses," but were instead routine, booking questions that did not constitute interrogation.  [Doc. 38 at 13-15].

The ruling in <u>Miranda</u> requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in

8

interrogation.  <u>See</u> <u>Garcia v. Singletary</u>, 13 F.3d 1487, 1489 (11th Cir. 1994).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)).  However, "*Miranda* was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from express questioning or its functional equivalent."  <u>United States v. Springfield</u>, No. CR406-390, 2007 WL 1140912, at *3 (S.D. Ga. Apr. 13, 2007), adopted by 2007 WL 1302282, at *1 (S.D. Ga. May 1, 2007) (citation and internal marks omitted). Interrogation for <u>Miranda</u> purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  <u>United States v. Gomez</u>, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)); <u>see also</u> <u>Innis</u>, 446 U.S. at 301-02 (emphasis and footnote omitted) ("[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police

officers that they should have known were reasonably likely to elicit an incriminating response.").

It is uncontested that Coleman was in custody at the time of the interview, see [Doc. 38 at 6-7; Doc. 34 at 5; Doc. 41 at 1], but the government disputes that Agent Dorman's pre-Miranda questioning of Coleman constituted interrogation that was reasonably likely to elicit an incriminating response, [Doc. 38 at 13-15].  The government argues that Agent Dorman did not ask Coleman the pre-*Miranda* questions to induce an incriminating answer, but was simply confirming his identity and booking information.  [Id.].  Although Agent Dorman's intent is relevant, it is not dispositive, see Innis, 446 U.S. at 301 & n. 7, because the pertinent inquiry is whether his questions were reasonably likely to elicit an incriminating response, and based on the evidence and particular facts and circumstances of this case, the Court finds that the questions posed by Agents Dorman and Degennaro prior to providing Miranda warnings sought routine biographical information and were not reasonably likely to elicit incriminating responses from Coleman.

"Routine booking questions—questions that are primarily biographical and not intended to elicit incriminating responses—are typically not considered to be interrogation subject to Miranda."  United States v. Royal, CRIMINAL ACTION NO. 1:09-CR-337-1-ODE-ECS, 2010 WL 11508453, at *2 (N.D. Ga. June 15, 2010) (citations

omitted).  Indeed, "the Supreme Court reasoned that because questions related to biographical information were reasonably related to a law enforcement agency's administrative concerns, such questions fall outside _Miranda's_ protection," United States v. Toumasian, Criminal Action File No. 1:10–cr–291–TCB–3, 2011 WL 3738980, at *4 (N.D. Ga. Aug. 22, 2011) (citation omitted), and an "officer's request for routine information . . . is not an interrogation under _Miranda_, even though that information turns out to be incriminating," United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991) (citation and internal marks omitted).[8]

Courts have found that "requesting 'pedigree' information, such as a name or nickname, does not constitute interrogation that is subject to _Miranda_ requirements." United States v. Adegbite, 846 F.2d 834, 837 (2d Cir. 1988); see also United States v. Washington, 462 F.3d 1124, 1133 (9th Cir. 2006) (citations omitted) (asking defendant about his gang moniker was not violative of Miranda because "[a]sking about a nickname, even if it is for identification purposes, is no different from simply asking for a suspect's name" and "[q]uestions about a person's identity are not unconstitutional even if identification of the person may help lead to the

---

[8] Although Coleman was not actually being booked at the time he was questioned, "courts have rejected the argument that the routine booking question exception applies only to the booking process, embracing instead a broader view that such routine questions generally fall outside of _Miranda's_ purview." United States v. Benais, Civil No. 13–192 (1) (RHK/LIB), 2013 WL 6078891, at *10 (D. Minn. Nov. 19, 2013), adopted at *1 (citations omitted).

prosecution of that person for a crime").  In addition, law enforcement officers may "ask occupants routine questions to discern who lives in a residence when executing a search warrant so as to satisfy administrative concerns."  Toumasian, 2011 WL 3738980, at *4-5 (collecting cases); see also United States v. Tapia-Rodriguez, 8:17CR314, 2018 WL 1737645, at *4 (D. Neb. Apr. 11, 2018) (internal marks omitted) (finding questions about defendant's "name and how long he had been living in the house" were "types of biographical questions [that] do not trigger Miranda"); United States v. Walton, Criminal Action No. 1:12–CR–395–CAP, 2014 WL 3519176, at *14 (N.D. Ga. July 15, 2014) (citation omitted) ("Under the routine booking exception, routine booking questions regarding a [d]efendant's age, height, weight, eye color, name, and current address are 'reasonably related to the police's administrative concerns,' and therefore exempt from Miranda's reach."); United States v. Chaidez-Reyes, 996 F. Supp. 2d 1321, 1346 (N.D. Ga. 2014), adopted at 1326 (finding questions about where defendant "lived and with whom satisf[ied] the book-in exception"); Royal, 2010 WL 11508453, at *2 (finding questions such as "name, date of birth, Social Security number, phone number, and educational level," as well as whether defendant had been arrested before, were not considered interrogation such that Miranda warnings should have been administered).

Moreover, to assess whether the questions concerning Coleman's address, street name, and prior incarceration were employed in a manner that would compel Miranda protection, as Coleman suggests, [Doc. 34 at 8 (arguing that agents "got him to admit, pre-*Miranda*, facts that would result in a probation violation at the very least")], the Court must engage in an objective inquiry and determine whether the agents should have known that asking Coleman these initial questions was reasonably likely to elicit an incriminatory response, see United States v. Lopez-Garcia, 565 F.3d 1306, 1317 (11th Cir. 2009); see also United States v. McKenzie, 132 F. App'x 788, 790 (11th Cir. 2005) (per curiam) (unpublished) (citation omitted) ("The focus of the inquiry is the perception of the suspect, not the intent of the police."); Rosa v. McCray, 396 F.3d 210, 222 (2d Cir. 2005) (citations omitted) ("To determine whether the police abused the gathering of pedigree information in a manner that compels *Miranda* protection requires an objective inquiry: Should the police have known that asking the pedigree questions would elicit incriminating information?").  Here, the agents asked Coleman questions during the brief initial discussion in an effort to ascertain his identity and address, and his answers to the questions posed would "in most instances be [] innocent and [] useful for [administrative concerns and] purposes of booking and arraignment[.]" United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986); see also United States v. Pabon, 603

F. Supp. 2d 406, 411 (N.D.N.Y. 2009) (citations omitted) (finding detective's "knowledge that the address information initially provided was incorrect or incomplete . . . [was] insufficient . . . to convert the pedigree question into the investigative sort of question which would require *Miranda* warnings").[9]

_____

[9] Coleman asserts for the first time in his reply brief that questioning him about his address was "designed to elicit incriminating statements and they did, as evidenced by the fact that officers took what Coleman told them about his other address and obtained a search warrant for that address." [Doc. 41 at 1 (citation omitted)]; see also [id. at 3 (citation omitted) ("The pre-*Miranda* questions he was asked about the other address he had given and who lived there were directly related to the search warrant the government later obtained for that address.")]. However, while the agents were obtaining routine biographical information, including Coleman's address, which he indicated to Agents Dorman and Degennaro was the apartment where the search was taking place, it came to Agent Degennaro's attention that Coleman had just provided a different address to another agent present on scene. (Tr. at 10-11, 26-27; Gov. Ex. 2 at 02:11-02:48). When faced with such circumstances, "[l]aw enforcement agents may ask clarifying or follow-up questions under the pedigree exception where 'the officer perceives–either through direct observation or otherwise–that a specific piece of information provided by the [defendant] is patently incorrect,'" United States v. Durr, No. 09–CR–6232L, 2010 WL 3199887, at *8 (W.D.N.Y. July 22, 2010), adopted by 2010 WL 3219369, at *1 (W.D.N.Y. Aug. 11, 2010) (citation omitted), which is exactly what happened in this case. And, the "exception contemplates that incriminating information will sometimes surface in response to primarily administrative, as opposed to investigative, questions." United States v. Gorrell, 360 F. Supp. 2d 48, 53 n.3 (D.D.C. 2004). In short, "[a]bsent a showing that the officers used the [] questions to elicit incriminating statements–and there has been no such showing here–[Coleman's pre-Miranda] statements as to where he lived could be used as a basis for obtaining a warrant to search his house." United States v. King, 165 F.3d 29 (6th Cir. 1998) (per curiam) (unpublished); see also Velazquez v. Lape, 622 F. Supp. 2d 23, 26-27, 33-34 (S.D.N.Y. 2008), adopted at 23 (internal marks omitted) (finding "address question was not a deliberate disguised attempt at an investigatory interrogation" where officer was attempting to clarify at which address defendant lived and then obtained a search warrant for that address).

Furthermore, "[i]t would not be reasonable for an officer . . . to anticipate that [Coleman] would respond to a question about previous arrests with a statement that could be used in a criminal trial," as "[a]n acknowledgment by a suspect that he had been arrested on a previous charge would likely be irrelevant to establishing the elements of a crime against the suspect in a subsequent criminal case based on a different charge." United States v. Hill, No. 12–CR–214(KAM), 2013 WL 3243657, at *12 (E.D.N.Y. June 26, 2013), aff'd, 658 F. App'x 600 (2d Cir. 2016) (unpublished) (citations omitted).  And, as the government points out, [Doc. 38 at 14-15], Coleman "has not shown that the ATF agents had any reason to expect that by answering their initial questions, he would be subject to a state prosecution for a possible probation violation," and "[s]uch a prosecution would not be 'their call,'" [id. at 15 (quoting Lopez-Garcia, 565 F.3d at 1317)].  In sum, the initial statements made by Coleman were not obtained in violation of Miranda, and they are not due to be suppressed on that basis.

**B.**   ***Post-Miranda Statements***

Coleman contends that his post-Miranda waiver statements must also be suppressed because they were the product of a statement obtained in violation of his Fifth Amendment rights, and that the government also bears the "burden to show that the statements were nevertheless voluntary[.]"  [Doc. 34 at 8]; see also [Doc. 41

15

at 4].  The government argues that Coleman's waiver was knowing, voluntary, and intelligent, and that his post-<u>Miranda</u> statements should not be suppressed as the product of his purported unlawful pre-<u>Miranda</u> statements.  [Doc. 38 at 6-13, 15-18]. Having already concluded that the pre-<u>Miranda</u> statements are not due to be suppressed as violative of <u>Miranda</u>, Coleman's argument that his "post-*Miranda* statement should be suppressed as tainted by the pre-Miranda questioning," [Doc. 34 at 1], is without merit.  Nevertheless, even if Coleman's pre-<u>Miranda</u> statements did constitute an interrogation that ran afoul of his <u>Miranda</u> rights, "the Court now considers whether [that] [would] ha[ve] any bearing on the statements that [Coleman] made following his subsequent written waiver of *Miranda* rights," <u>United States v. Ramirez</u>, 991 F. Supp. 2d 1258, 1267 (S.D. Fla. 2014); <u>see also</u> <u>United States v. Arroyo-Garcia</u>, Criminal Action No. 1:12–CR–0357–WBH, 2014 WL 1309078, at *9 (N.D. Ga. Mar. 31, 2014), adopted at *1.

Coleman first asserts that his post-<u>Miranda</u> statements must be suppressed because they were the fruit of the initial, unlawful statements.  [Doc. 34 at 8-9]. However, even when a defendant makes a pre-<u>Miranda</u> statement that is subject to suppression, which is not the case here, subsequent statements made after the defendant has waived his <u>Miranda</u> rights are admissible as long as they are voluntary.  <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 317-18 (1985).  As the Supreme Court

explained in Elstad, procedural violations of Miranda "differ[] in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine." Id. at 306.  While Fourth Amendment violations generally result in application of the exclusionary rule, statements obtained in violation of Miranda can still be used in limited circumstances, such as for impeachment purposes on cross-examination.  Id. at 306-07.

In Elstad, officers went to speak with the defendant, a teenage robbery suspect, at his home. Id. at 300.  The defendant made some incriminating statements to the officers, and was subsequently taken to the police station, where he gave a written confession after having been read his Miranda rights.  Id. at 300-02.  The initial statements were suppressed because they were obtained in violation of Miranda, but the Supreme Court held that the defendant's written statement was admissible because it was given after a voluntary waiver of defendant's Miranda rights.  Id. at 314-17.  As the Court stated:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

Id. at 309.  Because both the suppressed statement and the written confession were given voluntarily, the Supreme Court held that the defendant's post-Miranda waiver statement was admissible.  Id. at 314-17; see id. at 318 (footnote omitted) ("[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary.  The relevant inquiry is whether, in fact, the second statement was also voluntarily made.").

The Supreme Court refined Elstad's holding in Missouri v. Seibert, 542 U.S. 600, 617 (2004), finding that a second, post-Miranda confession is not admissible when it is the product of deliberate withholding of Miranda warnings by police officers.[10]  In Seibert, officers interviewed the defendant and obtained incriminating statements from her before providing Miranda warnings.  Id. at 604-05.  The officers then read the defendant her Miranda rights and used her prior statements to elicit post-Miranda waiver confessions.  Id. at 605-06.  The Supreme Court found that the post-Miranda waiver statements were subject to suppression as products of the

_____

[10] The Court's decision in Seibert was a plurality opinion.  See 542 U.S. at 600. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ."  Marks v. United States, 430 U.S. 188, 193 (1977) (alteration in original) (citation and internal marks omitted).  The Eleventh Circuit, along with most other circuits, has concluded that Justice Kennedy's concurrence represents Seibert's holding.  See United States v. Street, 472 F.3d 1298, 1313-14 (11th Cir. 2006); United States v. Hernandez, 200 F. App'x 283, 286 n.1 (5th Cir. 2006) (unpublished) (collecting cases); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir. 2005).

initial statements because the initial statements were used to leverage the post-Miranda waiver confession and the defendant did not know that her initial statements could not be used against her.  Id. at 616, 621-22.  As Justice Kennedy stated, "[w]hen an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps."  Id. at 621.  However, Justice Kennedy also explained that "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed."  Id. at 622.  Thus, absent deliberate withholding of Miranda warnings, Elstad continues to control the admissibility of post-Miranda warning statements when an initial statement was given in violation of Miranda.  Street, 472 F.3d at 1313-14; Naranjo, 426 F.3d at 232.

In this case, there is no evidence that the agents deliberately withheld reading of the Miranda warnings while attempting to elicit incriminating statements from Coleman.  In fact, Coleman even concedes that the "agents' conduct in this case is not as clear a violation as in *Missouri v. Seibert*, where an agency had an express policy of questioning first, then giving Miranda and then questioning again," but he contends that the agents still got him "to answer incriminating questions prior to

19

giving *Miranda* warnings[.]"   [Doc. 41 at 4 (citation omitted)].   However, the evidence shows that, as soon as the agents obtained all of the biographical information, which took approximately four minutes and forty seconds, they read Coleman the <u>Miranda</u> warnings, which he indicated he understood by initialing the form beside each question and signing the waiver of rights portion of the form.  (Tr. at 11, 27-28; Gov. Exs. 1 & 2).  The interview then proceeded for a little more than one hour, during which the agents questioned Coleman.  (Tr. at 13-14, 29; Gov. Ex. 2 at 07:04-1:04:35).

When, as here, the subject matter of the pre-<u>Miranda</u> and post-<u>Miranda</u> statements differs, it is less likely that the officers were using the deliberate interrogation tactics that invoke <u>Seibert</u>.  <u>See</u> <u>United States v. Stewart</u>, 536 F.3d 714, 722 (7th Cir. 2008) ("[T]he lack of overlap between the warned and unwarned statements is evidence that the interrogator did not deliberately use a two-step strategy designed to circumvent *Miranda*."); <u>Street</u>, 472 F.3d at 1314 (finding that agent's questioning was not an attempt to circumvent <u>Miranda</u> in part because he "did not withhold *Miranda* warnings, solicit a full confession, and then lead [defendant] back through his confession again").  Because there is no evidence that the agents were employing a deliberate tactic to deprive Coleman of his protections against self-incrimination, <u>Elstad</u> applies.  <u>See</u> <u>Hernandez</u>, 200 F. App'x at 287

(internal marks omitted) (holding that, because there was no evidence that the officers "were pursuing any kind of deliberate strategy that would require suppression of the statement under *Seibert*," Elstad applied to the case); see also Street, 472 F.3d at 1314 (holding that Elstad applied because the agent did not use interrogation techniques designed to undermine the Miranda warnings).

As a result, even if Coleman's pre-Miranda statements were subject to suppression, Coleman's post-Miranda statements would still be admissible if both these statements were voluntary.  See Elstad, 470 U.S. at 318.  A statement given in violation of Miranda will still be voluntary if the police did not violate the defendant's Fifth Amendment rights.  Martin v. Wainwright, 770 F.2d 918, 928 (11th Cir. 1985), modified on other grounds on denial of reh'g, 781 F.2d 185 (11th Cir. 1986) (per curiam).  In assessing whether a confession was voluntary, the court must determine whether the defendant "'made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.'"  Id. at 924 (quoting Jurek v. Estelle, 623 F.2d 929, 937 (5th Cir. 1980), abrogated on other grounds as recognized in, Stano v. Butterworth, 51 F.3d 942 (11th Cir. 1995)[11]).

---

[11] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

In this case, there is no evidence that either Coleman's pre-<u>Miranda</u> or post-<u>Miranda</u> statements to the agents were involuntary.  There is no evidence that the agents employed any coercion, threats, or improper inducements at any time during the interview.  <u>See</u> (Gov. Ex. 2).  Coleman never asked to end the interview or to speak with an attorney, and in fact, he requested to speak with the agents a second time after the first interview concluded.  <u>See</u> (<u>id.</u>).  In addition, "[t]he fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative."  <u>Elstad</u>, 470 U.S. at 318.  As discussed hereinafter, Coleman was read his <u>Miranda</u> rights, waived them, and continued speaking with the agents at two different times, once at his request.  Given these circumstances, the undersigned concludes that Coleman's statements were voluntary.  However, Coleman's post-<u>Miranda</u> statements may nonetheless be subject to suppression if Coleman's waiver of his <u>Miranda</u> rights was not knowing, intelligent, and voluntary, which Coleman has not argued, but the Court will briefly address.

The government bears the burden of proving by a preponderance of evidence that Coleman validly waived his <u>Miranda</u> rights.  <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir. 1997); <u>see also</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986).  In <u>Miranda</u>, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's

will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, <u>Miranda</u> established certain procedures officers must follow. <u>Id.</u> Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." <u>Id.</u> at 468-70.[12] <u>Miranda</u> further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." <u>Id.</u> at 473-74 (footnote omitted). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." <u>Id.</u> at 474.

A defendant may waive his rights if the waiver is made voluntarily, knowingly, and intelligently. <u>Id.</u> at 444. This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only

---

[12] There is no dispute that the agents provided Coleman adequate <u>Miranda</u> warnings.

if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The voluntariness analysis often depends on whether "the defendant's will was overborne." Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (citations omitted). Thus, to find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167; see also Moran, 475 U.S. at 421 ("[T]he relinquishment of the [Miranda] right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."). Therefore, "in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary." United States v. Minard, 208 F. App'x 657, 660 (10th Cir. 2006) (unpublished).

"A valid waiver, however, requires more than just a finding of voluntariness. In addition to being voluntary, a waiver of *Miranda* rights must also be knowing and intelligent." Id. (citation omitted). In contrast to a finding of voluntariness, the

court "need not find coercion in order to find a defendant's waiver unknowing or unintelligent." Id. (citation omitted). "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a 'requisite level of comprehension.'" Minard, 208 F. App'x at 660 (quoting Moran, 475 U.S. at 421). However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver. United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002) (citation omitted); see also North Carolina v. Butler, 441 U.S. 369, 373 (1979).

As indicated earlier, "'[a] waiver is knowing and intelligent only if it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" United States v. Wattree, 544 F. Supp. 2d 1262, 1274 (D. Kan. 2008) (quoting Minard, 208 F. App'x at 660) (internal marks omitted). Thus, "'[a] defendant need not . . . understand all the consequences of the waiver. He need only understand his right to remain silent or have his statements used against him.'" Id. at 1274-75 (citations omitted). Whether a suspect intelligently waived his rights depends on the particular circumstances in a case,

including the background, experience, and conduct of the accused. Edwards, 451 U.S. at 482 (citations omitted).

Agent Dorman testified, and the audio recording confirms, that he never threatened Coleman or promised him anything in exchange for information, but made him more comfortable by placing his handcuffs in front and turning off the air conditioning after he indicated that he was cold. (Tr. at 14, 28-29; Gov. Ex. 2). Coleman does not argue that his Miranda waiver was the product of police coercion, see generally [Docs. 19 & 34], and based on the testimony and audio recording, the Court concludes that Coleman's waiver was free of coercion and was therefore voluntary, see United States v. Robinson, Criminal Action No. 1:14–CR–0176–RWS, 2014 WL 6667018, at *6 (N.D. Ga. Nov. 24, 2014), adopted at *1 (finding "the record show[ed] that [d]efendant's waiver of []his rights was voluntary and that the agents engaged in no improper coercion or other tactics to overpower [d]efendant's free will"). Moreover, Coleman does not dispute that his waiver was knowing and intelligent, and after examining the totality of the circumstances, Minard, 208 F. App'x at 660 (citation and internal marks omitted) ("[T]he totality of the circumstances must demonstrate a defendant waived his rights with a requisite level of comprehension."), the undersigned finds that the government has met its burden of showing a knowing and voluntary waiver. Indeed, after Agent Dorman read

Coleman his <u>Miranda</u> rights, Coleman placed his initials beside each right and then signed the waiver portion of the form, which was admitted into evidence at the evidentiary hearing.  (Gov. Exs. 1 & 2).  Coleman did not ask the agents to repeat anything, nor did he ask any questions or give any indication that he did not understand what was being read. (Gov. Ex. 2).  At no point during the interview did Coleman ask to end the interview or to speak with an attorney, and he did not appear to be under the influence of alcohol or drugs, though he mentioned some discomfort from a previous gun shot wound in his thigh area, but did not request any medical attention.  (Tr. at 12, 16, 28; Gov. Ex. 2).  In fact, Coleman initiated a second interview with the agents about ten to fifteen minutes after the first interview had concluded, and Agent Dorman reminded him that the same <u>Miranda</u> warnings he had provided earlier still applied, which Coleman indicated he understood and then proceeded to make additional incriminating statements. (Tr. at 11-12, 14-15, 29-31; Gov. Ex. 2).  Thus, the government has met its burden of proving that Coleman's waiver of his <u>Miranda</u> rights was voluntary, knowing, and intelligent.  Accordingly, it is hereby **RECOMMENDED** that Coleman's motion to suppress his statements be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Coleman's motion to suppress statements, [Doc. 19], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 14th day of June, 2018.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE